**[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 496.]**

OFFICE OF DISCIPLINARY COUNSEL *v*. CLIFTON.

**[Cite as *Disciplinary Counsel v. Clifton*, 1997-Ohio-159.]**

*Attorneys at law—Misconduct—Permanent disbarment—While filling dual role of guardian and attorney to the guardian, allowing ward's assets to dissipate and appropriating funds of the estate for business and personal use.*

(No. 96-2805—Submitted May 7, 1997—Decided October 1, 1997.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 94-58.

———————————

{¶ 1} On October 21, 1994, relator, Office of Disciplinary Counsel, filed an amended complaint charging in two counts that respondent, William Deems Clifton II of Cincinnati, Ohio, Attorney Registration No. 0038076, violated eight Disciplinary Rules while acting as the guardian of an estate, and in another count, that respondent violated an additional Disciplinary Rule and a Rule for the Government of the Bar by failing to pay attorney registration fees on a timely basis during the 1989/1991, 1991/1993 and 1993/1995 biennia. After respondent filed an answer, the matter was heard by a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

{¶ 2} The panel found that on February 3, 1984, the Hamilton County Probate Court appointed respondent guardian of the person and estate of Ollie R. Cawein, an incompetent, after the death of her brother, who was the prior guardian. At the time of respondent's appointment, Cawein's assets totaled over $500,000, mostly consisting of stocks, bonds and cash, in addition to two residences in Cincinnati and two lots in Florida. Between February 1984 and December 1992, when respondent resigned as guardian, respondent placed estate funds totaling

$296,236.72, either into his private business or personal accounts and used them for business and personal expenses.

{¶ 3} Between April 1986 and September 1990, respondent not only retained for his own use dividends and interest belonging to the estate, but also borrowed $172,407 from Cawein's estate without authority. He retained proceeds of sales of the estate's stocks, proceeds from the sales of stocks received in stock splits, and proceeds from distributions of the estates of Cawein's relatives and executed six personal five-year promissory notes for the borrowed amounts. He did not timely pay these notes because he determined at the time the notes were due that Cawein's estate did not need the money and that it was not convenient for him to make the payments. Respondent transferred the funds represented by the notes to Jamaica Trading Shares, Inc., a Delaware corporation that he formed and owned. The funds in Jamaica Trading were used to meet respondent's professional and personal obligations, such as the purchase of an automobile for himself. Respondent did not report the receipt of stock from stock splits in his annual guardianship reports. Not only did the estate fail to receive the funds represented by the notes, but it also failed to realize interest had the funds been received and invested.

{¶ 4} Cawein was an incompetent as a result of a stroke incurred in 1976. She resided in a nursing home and had little prospect of occupying either of the two residences she owned in Cincinnati. Yet respondent failed to sell either property, and during his guardianship realized only $13,205.62 in rental income from one of the properties. During respondent's tenure as guardian, operating expenses of these two properties exceeded the rental income by $15,287.99. In addition, while he was guardian respondent spent an additional $64,442.34 in repairs on these properties. Respondent did not maintain insurance on either property, and because he did not file tax returns for the estate for several years, tax liens were placed on

the properties. Eventually, the liens were removed after respondent paid the taxes and penalties.

**{¶ 5}** Respondent also neglected to maintain the two real estate lots in Florida appraised at $11,000 and owned by the estate. His failure to pay property taxes on the Florida real estate resulted in the lots' being sold at a sheriff's sale.

**{¶ 6}** Because respondent failed to account for the use of Social Security income from November 1989 through March 1993, the Department of Health and Human Services suspended Cawein's Social Security payments totaling $27,429. Although the suspended amounts were ultimately recovered, the estate lost $5,800 in interest that could have been realized had the funds been received and invested.

**{¶ 7}** Without court approval, respondent paid himself an aggregate of $66,985 in attorney fees and guardianship fees during the period he served as both attorney and guardian. However, respondent did not retain records of time expended or work performed to support the fees charged.

**{¶ 8}** The panel also found that during his guardianship respondent visited Cawein infrequently. His testimony indicated that during the six years of his guardianship, he purchased only $800-$1,200 in clothes for her, and the employees of the nursing home testified that Cawein was dressed with clothes left at the nursing home when other occupants departed or died. Respondent also claimed that he did repair Cawein's broken television at one time, and that if it was subsequently not working, he did not know about it. Respondent would not authorize speech therapy for Cawein, nor would he authorize the purchase for Cawein of a recommended "lap board" and a "communication board" (an item with icons to which she could point to indicate her needs). The estate, however, maintained a subscription to The Wall Street Journal.

**{¶ 9}** On May 31, 1991, the nursing home contacted the Hamilton County Probate Court indicating serious concerns about the Cawein guardianship. The nursing home cited not only respondent's failure to visit his ward and his disregard

for her everyday needs, but also the fact that the estate owed the nursing home over $18,000 for care and maintenance of Cawein. After an investigation by the court, respondent resigned as guardian in December 1992.

{¶ 10} On January 8, 1993, the court appointed Dolores Schuessler as successor guardian. When Schuessler visited the nursing home three days after her appointment, she found Cawein dressed in very worn clothing and living in a crowded, shabby room, with no curtains on the windows. Schuessler purchased clothing for Cawein, as well as a television set and a recliner chair to replace her wheelchair. Schuessler requested an immediate dental exam of Cawein and arranged to have fresh flowers sent to Cawein every week. Schuessler rescinded the order of respondent "do not hospitalize" and told the nursing home Cawein was to have every care possible. During the approximately seventy days she was guardian until Cawein died on March 17, 1993, Schuessler visited Cawein eight times.

{¶ 11} As a result of the audit requested by Schuessler, the Hamilton County Probate Court found in September 1994 that during the term of his guardianship, respondent had violated his fiduciary duty to the Cawein estate; the court ordered him to make restitution in the amount of $400,282.88 for funds he had mismanaged, commingled, or lost. The restitution amount consisted of the following: $22,869.95 for losing or forfeiting assets; $79,094.91 for unpaid interest on the six promissory notes; $41,194.07 for interest lost on funds not received by the estate and not accounted for by the promissory notes; $74,187.33 for losses incurred in the management of the estate's real property; $66,985 for attorney and guardianship fees received by the respondent; $47,369.58 for statutory interest on the above amounts from January 1, 1993 through September 1, 1994; and $68,582.04 for the expenses incurred by the successor guardian to trace assets of the estate and satisfy liens. The order of restitution was affirmed on appeal. *In re*

4

*Guardianship of Cawein* (Nov. 1, 1995), Hamilton App. No. C-940885, unreported, 1995 WL 653853.

{¶ 12} The panel found that the $172,704 which respondent had borrowed from the estate had been repaid and that respondent's bonding company had settled the $400,282.88 judgment.

{¶ 13} The panel concluded that respondent had clearly and convincingly violated DR 1-102(A)(3) (engaging in illegal conduct involving moral turpitude), 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(5) (engaging in conduct prejudicial to the administration of justice), 1-102(A)(6) (engaging in conduct that adversely reflects upon the fitness to practice law), 6-101(A)(3) (neglecting an entrusted legal matter), 7-101 (A)(3) (intentionally prejudicing or damaging a client during the course of the professional relationship), and 9-102(A) and (B) (failing to preserve the identity of the funds and property of the client). As to the charge that respondent had failed to pay attorney registration fees on a timely basis, the panel found violations of Gov.Bar R. VI(1)(A) and DR 1-102(A)(6). Inasmuch as respondent's activities took place over a six-year period and were designed to conceal the defalcations, the panel found no mitigating circumstances. The panel recommended that respondent be disbarred.

{¶ 14} The board adopted the findings, conclusions, and recommendation of the panel.

—————————————

*J. Warren Bettis,* Interim Disciplinary Counsel*, Lori J. Brown* and *Cynthia L. Roehl*, Assistant Disciplinary Counsel, for relator.

*Gary R. Lewis*, for respondent.

—————————————

*Per Curiam.*

{¶ 15} The respondent undertook the dual roles of guardian and attorney for the guardianship of both the person and the estate of an incompetent woman who it appears had no close relatives. As the record indicates, respondent failed miserably in the performance of his duties in both roles. Over a six-year period respondent wasted his ward's considerable estate through both negligence and design. Just as important, over those same six years, respondent failed to provide adequately for the care and comfort of his ward.

{¶ 16} A guardian of the estate is required by R.C. 2111.14(B) to manage the estate for the best interest of the ward. The duty of management requires that the guardian attend to the assets of the ward as a prudent person would attend to his or her own assets. The record here indicates that respondent, filling the dual role of guardian and attorney to the guardian, not only allowed assets of Cawein's estate to dissipate but also appropriated funds of the estate to his own use.

{¶ 17} A guardian of the person is required by R.C. 2111.13(A) to protect the person of the ward and to provide suitable maintenance as the amount of her estate justifies. Thus, the guardian of an elderly woman has a duty to provide care and maintenance according to her means and position in life. *Tonge v. Salisbury* (1934), 54 R.I. 170, 171 A. 372. The successor guardian found Cawein poorly dressed in a crowded, shabby room with no curtains, a broken television, and an inadequate wheelchair. Under those circumstances, respondent failed to maintain Cawein according to the means of a woman with an estate initially valued at over $500,000. The successor trustee in this case took the kind of responsible action that should have been taken by respondent.

{¶ 18} A guardian of the person of an elderly incompetent must take steps to see that the ward, however incapacitated, has the comfort and care that he or she could afford were the ward personally able to order such care. Frankly, we find

6

respondent's actions as the guardian of the person and estate of Cawein to be despicable and contemptuous.

{¶ 19} As to respondent's responsibility as attorney for the guardianship, we said in *Disciplinary Counsel v. Lucey* (1984), 14 Ohio St.3d 18, 21, 14 OBR 322, 324, 470 N.E.2d 888, 890, "'There are few ethical breaches which impact more negatively on the integrity of the legal profession than the misuse of a client's funds.'" Recently we said, "Public trust in the legal profession is tested daily in the service provided by each individual lawyer to his or her clients. When a lawyer, who has taken responsibility for a client's papers or property, commingles client funds or dissipates that property, the lawyer not only ill serves the client but also contributes to the erosion of public trust in the profession." *Miami Cty. Bar Assn. v. Hallows* (1997), 78 Ohio St.3d 75, 77, 676 N.E.2d 517, 518. In that case and in *Cleveland Bar Assn. v. Armon* (1997), 78 Ohio St.3d 497, 678 N.E.2d 1371, we noted that the appropriate sanction for the misuse of client funds is disbarment.

{¶ 20} In this case, unlike *Miami Cty. Bar Assn. v. Hallows,* we find no mitigating circumstances whatever. Respondent is permanently disbarred from the practice of law in Ohio. Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____